# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NEW YORK

GILBERTO AGUDO-MARTINEZ,

                                        Plaintiff,

        -vs-                                        DECISION and ORDER

JO ANNE B. BARNHART, Commissioner                   05-CV-6125 CJS
of Social Security,

                                Defendant.

## APPEARANCES

For plaintiff:                          Richard A. Goldberg, Esq.
                                        600 Wilder Building
                                        One East Main Street
                                        Rochester, NY 14614

For defendant:                          Kathleen M. Mehltretter
                                        Acting United States Attorney
                                        by Christopher V. Taffe, A.U.S.A.
                                        United States Attorney's Office
                                        620 Federal Building
                                        Rochester, NY 14614

                                        Of Counsel:
                                        Barbara L. Spivak, Esq.
                                        Chief Counsel, Region II
                                        Susan Reiss
                                        Assistant Regional Counsel
                                        Office of the General Counsel
                                        Social Security Administration

## INTRODUCTION

**Siragusa, J.** This case is before the Court on the Commissioner's motion (# 9) for

judgment on the pleadings, and plaintiff's cross-motion (# 11), also for judgment on the

pleadings. Having reviewed this case pursuant to 42 U.S.C. § 405(g), the Court determines

that the Commissioner's finding that plaintiff is not disabled must be reversed.

## PROCEDURAL HISTORY

Plaintiff applied for disability insurance benefits and supplemental security income benefits on June 29, 2001 alleging that he had been disabled since December 31, 1999. (R. 82-84, 715-17.) After his applications were denied (R. 35-37, 719-22), plaintiff requested a hearing. (R. 38, 723.) On February 19, 2004, plaintiff and his counsel appeared at a hearing before administrative law judge ("ALJ") Nancy Lee Gregg. (R. 731-69.) The ALJ held the record open so that plaintiff could submit additional evidence. (R. 768.) On June 3, 2004, ALJ Gregg held a supplemental hearing. (R. 770-97.) In a decision dated July 28, 2004, the ALJ found that plaintiff was not disabled. (R. 20-32.) This became the final decision of the Commissioner on January 8, 2005, when the Appeals Council denied plaintiff's request for review. (R. 8-10.)

## BACKGROUND

### *Vocational and Other Evidence*

Plaintiff was born on November 2, 1942 in Puerto Rico and came to the United States in 1960. (R. 736.[1]) He is five feet, nine inches tall and weights about 150 pounds. (*Id.*) He was divorced "many years ago" (*Id.*) and has a bachelor's degree[2] in sociology, which he received in 1974. Plaintiff worked as a nutritional educator for Monroe County in

---

[1]From plaintiff's testimony before the ALJ on February 19, 2004.

[2]In a disability examination conducted on August 14, 2001, Dr. Samuel Balderman noted that plaintiff had finished twelfth grade, "and some college level courses." (R. 320.) In her report, Dr. Karen Davenport, a psychologist, noted that plaintiff informed her that he had completed only two years of college. (R. 326.) However, in an assessment report dated January 8, 2003, Elizabeth H. Driscoll, CSW, noted that plaintiff had "a B.S. degree in sociology…." (R. 440.) In a November 21, 2003 report, Rekha Shrivastava, a therapist, wrote that plaintiff obtained a bachelor's degree in sociology and worked as a drug counselor in New York City, resigning in 1981. (R. 448.)

1999. This position involved educating members of the community about nutritional programs, teaching them how to read nutrition labels and informing them on issues such as food poisoning. (R. 739-40.) He had also worked as a caseworker and as a case manager for the Volunteers of America. (R. 741.) Plaintiff testified that he had a pattern of missing entire days of work due to arrhythmia.[3] (R. 746-49.) Although plaintiff also suffers from diabetes, he stated that it was only his arrhythmia that prevented him from working. (R. 752-53.) Specifically, he testified that, "I know that if I could cure the arrhythmias, I wouldn't need to have any Social Security." (R. 752.)

Ms. Julie Andrews testified as a vocational expert at the hearing. The ALJ asked the her to consider an individual of plaintiff's age, education, prior work experience and residual functional capacity. (R. 781-82.) Ms. Andrews testified that plaintiff could perform his prior work as a food management aide and he could also perform the job of information clerk. (R. 782, 783-84, 785.)

**Medical Evidence**

Dr. Charles Ippolito has been plaintiff's primary care physician since March 28, 1997. (R. 233.) In a January 7, 1998 progress note, Dr. Ippolito stated that plaintiff's condition was stable with medication and he had no recurrence of atrial fibrillations while taking his medication. (R. 520.) On examinations covering the period from March 13, 1998 through December 28, 1998, Dr. Ippolito found that plaintiff's heart rate was regular with no tachycardia. (R. 509, 510, 512, 513, 517.)

---

[3]Arrhythmia is defined as an alteration in rhythm of the heart beat either in time or force. Merriam Webster's Medical Desk Dictionary (1993) at 49.

Plaintiff visited Rochester General Hospital on October 28, 1999, complaining of central chest pressure with no sense of palpitation. (R. 263-64.) Plaintiff's pulse was irregular, but his heart sounds were normal. Plaintiff was given Nitroglycerin, Heparin and Tridil and was discharged on October 30, 1999. (R. 264.) An angiogram on November 1, 1999 revealed normal coronary arteries and normal left ventricular function. (R. 265, 504.)

In a follow-up examination on November 18, 1999, Dr. Ippolito found that plaintiff's heart was regular. (R. 504.) He assured plaintiff that his angiogram was normal and he was not at increased risk for a coronary event. (*Id.*)

In a progress note dated January 21, 2000, Dr. Ippolito stated that plaintiff had been doing well since his last visit. (R. 501.) Dr. Ippolito also noted that plaintiff had a history of complaints of palpitations, but that "[t]hese have been worked up and have not showed any significant pathology but he did have episodes two or three years ago of afibrillation." (*Id.*) The doctor also reported that although plaintiff was "[e]xperiencing palpitations; however I am not sure if these are legitimate or not." (*Id.*) He advised plaintiff that if he experienced "episodes that last for longer than half an hour he should report to [the] Emergency Department to determine if these are in fact afibrillation." (*Id.*)

Plaintiff visited Genesee Hospital on May 20, 2000 with an admission diagnosis of premature atrial contractions. (R. 602-03.) Plaintiff was admitted for observation. Regarding this admission, Dr. Ippolito stated that there was no evidence of arrhythmia during his hospitalization, although plaintiff had occasional premature atrial contractions. Dr. Ippolito reassured plaintiff that they were not of any significance. (*Id.*)

Plaintiff visited Genesee Hospital again on May 29, 2000 stating that his heart was "out of sync." (R. 305.) He denied chest pain or shortness of breath and he was in no acute distress. Plaintiff remained in normal sinus rhythm and his heart was regular at discharge. (*Id.*)

On June 8, 2000, plaintiff was seen by Dr. Ippolito for another follow-up on his complaints of arrhythmia. Dr. Ippolito reported that plaintiff's heart was regular and an EKG performed in the office showed normal sinus rhythm and no signs of atrial fibrillation or premature atrial contractions. (R. 496.)

On September 22, 2000, Dr. Ippolito saw plaintiff for a follow-up visit. At that time, plaintiff expressed concern that his weight had dropped to 164 pounds. However, Dr. Ippolito noted that previously plaintiff's weight had been 165 pounds. Dr. Ippolito reassured plaintiff and wrote in his progress note that plaintiff's atrial fibrillations were stable on medication and his heart was regular. (R. 491.)

Plaintiff again visited Dr. Ippolito on November 24, 2000 to complete disability forms. (R. 487.) Dr. Ippolito wrote in his progress note that plaintiff "was unable to effectively maintain a position in the work place on a functional and consistent basis due to his medical illnesses, which include diabetes, paroxysmal atrial fibrillation, which predisposes him to episodes of severe palpitation and in the past has required hospitalization." (R. 487.)

Plaintiff visited Genesee Hospital on December 16, 2000 complaining of midsternal chest pain. (R. 293.) Dr. Ippolito examined him there and found that plaintiff's lungs were clear and his heart was regular. An EKG revealed normal sinus rhythm. A stress echocardiogram revealed no evidence of ischemia. Myocardial infarction was ruled out. Plaintiff was discharged on December 18, 2000 in good condition. (*Id.*)

When plaintiff visited Dr. Ippolito for follow-up on December 28, 2000, his heart was regular. (R. 484.) Plaintiff again complained of weight loss, which Dr. Ippolito attributed to underlying stress and anxiety. (R. 484.)

Dr. Ippolito again saw plaintiff for a follow-up visit on January 18, 2001. Dr. Ippolito noted that plaintiff continued to complain of experiencing arrhythmia, and also noted he had been seen in cardiology multiple times. He further indicated that plaintiff, "is quite [an] anxious individual and I have counseled him in the past. I think he would be a good candidate for antianxiety medication." (R. 483.) Dr. Ippolito provided plaintiff with a sample of Serzone. (*Id.*)

In a progress note on January 24, 2001, Dr. Ippolito reported plaintiff's history of paroxysmal atrial fibrillation, an underlying anxiety level and a history of diabetes. (R. 241.) He also wrote that plaintiff appeared well and his heart was regular. (R. 241.) During this visit Dr. Ippolito adjusted certain medications previously prescribed by discontinuing some, while increasing his dosage of Tambocor, to decrease the incidents of palpitations.

On February 15, 2001, Dr. Ippolito noted that plaintiff had not experienced frank atrial fibrillation since he began taking Flecainide. (R. 480.) He also noted that plaintiff's diabetes was controlled with diet alone. (*Id.*) When plaintiff returned on February 28, 2001, Dr. Ippolito commented that plaintiff was feeling well with no acute symptoms. (R. 240.) Dr. Ippolito's progress notes dated April 9, 2001, reveal that plaintiff's heart rate was regular. (R. 237.)

On June 15, 2001, Dr. Ippolito, in a "to whom it may concern" letter, wrote:

This is to certify that Gilberto Agudo Martinez has been under my care since 3/28/97. Mr. Martinez has been diagnosed with a heart disease known as Atrial Fibrillation of the Heart, a chronic life time condition. He also suffers

-6-

from chronic Diabetes Mellitus. Additionally has BPH (enlargement of the prostate). Recently he has been diagnosed with Microhematuria, with its origin yet unknown.

Mr. Martinez has to be under ongoing medical care, and under medication for most of these conditions, notably Atrial Fibrillation and Diabetes. He has been hospitalized three times at Genesee Hospital and one time at Rochester General Hospital for his heart condition. Because he is likely to need medical care and/or hospitalization at any given time it is my opinion that he is unemployable at the present time, and for the foreseable [sic] future, unless his conditions dramatically improve.

(R. 233.)

Plaintiff saw Dr. Michael Falkoff, a cardiologist, on June 19, 2001. (R. 419.[4]) Dr. Falkoff noted that plaintiff "has periods where his heart goes out of rhythm." (*Id.*) An EKG showed sinus rhythm with a leftward axis. Dr. Falkoff stated that plaintiff was doing well clinically and planned to see plaintiff on a yearly basis, recommending that he also undergo an annual stress test "to make sure there is no coronary disease." (*Id.*)

Dr. Ippolito saw plaintiff on July 6, 2001. Plaintiff complained of a cough and congestion. (R. 377.) Dr. Ippolito noted that plaintiff appeared well and was in no acute distress, but that he should increase his intake of fluids. Dr. Ippolito saw plaintiff again on July 18, 2001. (R. 380.) Plaintiff complained of increased thirst. Dr. Ippolito noted that plaintiff "appears well and in no acute distress." (*Id.*) He advised plaintiff to drink six to eight glasses of water per day, and to cut down on salty food.

Plaintiff saw Dr. Ippolito again on August 29, 2001 to discuss his weight loss. (R. 382.) Plaintiff reported that his weight was 153 pounds, down from 171 in June 2000. Dr. Ippolito also noted, "[h]e is a very anxious person. He states that he is under increased

---

[4]The record contains two pages marked as 419. The first is Dr. Falkoff's letter and the second is a copy of the Handbook of Severe Disability.

stress and does feel depressed." (*Id.*) Dr. Ippolito further reported that plaintiff's diabetes was controlled with diet, that plaintiff refused a blood test for HIV, and that his diagnostic impression was anxiety and depression. With regard to plaintiff's anxiety and depression, Dr. Ippolito wrote that plaintiff "has refused medications. He is also refusing mental health referral." (*Id.*)

Dr. Samuel Balderman conducted a consultative disability examination of plaintiff on August 14, 2001. (R. 320-23.) He observed that plaintiff appeared to be in no acute distress. (R. 321.) Examination of plaintiff's heart revealed normal sinus rhythm. There was left atrial hypertrophy, and there was no murmur, gallop or rub. Plaintiff's affect was depressed and somewhat flat. Dr. Balderman diagnosed plaintiff's condition as history of alcohol abuse and paroxysmal atrial fibrillation, well controlled. (R. 322.) Dr. Balderman stated that plaintiff had "some minimal physical limitations" and that his major limitations were related to his clinical depression. (R. 323.)

Karen Davenport, Ph.D., conducted a consultative psychiatric examination of plaintiff on September 18, 2001. (R. 326-30.) Dr. Davenport wrote that when asked "why he had reported on his form that he had anxiety and depression" he stated that, "his doctor recommended that he see a psychiatrist but he refuses to get treatment." (R. 326-26.[5]) Plaintiff denied any history of psychiatric hospitalization or treatment. (R. 326.) He reported that he has no difficulty with his activities of daily living except he felt "that the mess in his house is overwhelming" at times. (R. 328.) Dr. Davenport observed that plaintiff was adequately groomed, that he was cooperative, and that his social skills were grossly intact.

---

[5]The record contains two pages marked as 326, the first two pages of Dr. Davenport's report.

(R. 327.) Further, she observed that his thought process was coherent and goal directed with no evidence of hallucinations, delusions or paranoia, that his sensorium was clear and he was oriented to person, place and time, and that his attention and concentration was grossly intact. (*Id.*) However, Dr. Davenport found that plaintiff's recent and remote memory skills were mildly impaired, though she determined that his intellectual functioning appeared to be average to above average. She also concluded that his insight was poor and his judgment was fair. (R. 328.)

Moreover, Dr. Davenport opined that plaintiff would be able to follow and understand simple directions and instructions, that he would be able to perform simple rote tasks under supervision, and that he would probably be able to maintain attention and concentration for short periods of time. She also formed the opinion, though, that he might have difficulty consistently performing simple tasks over time because of symptoms of depression. (R. 329.) Dr. Davenport's prognosis was "guarded at this time given that this claimant does not appear motivated to participate in any type of psychiatric treatment." (R. 329.)

Plaintiff visited Dr. Ippolito for follow-up on November 15, 2001. (R. 385.) Dr. Ippolito noted that plaintiff felt more relaxed and had an improved appetite after having recently spent two weeks in Puerto Rico visiting his family. Plaintiff had no acute symptoms to report. On examination, plaintiff's heart was regular. Dr. Ippolito stated that plaintiff experienced occasional intermittent palpitations, but his condition was stable and that his diabetes was controlled with diet. (R. 385.)

Plaintiff saw Elizabeth Driscoll, a social worker at Unity Health Services on January 31, 2002. (R. 440-42.) Evidently he had been referred by another social services provider. (*See.* R. 439.) He presented with symptoms of anxiety and voiced many somatic

complaints. (R. 440, 443.) Plaintiff denied any previous psychiatric treatment except for alcohol use in the past, but stated that he had stopped using alcohol three years ago. (R. 440.) Ms. Driscoll observed that plaintiff was neatly dressed and groomed and he made good eye contact (R. 441.) She reported that plaintiff was fully oriented and that his speech had normal rate, tone and volume. Ms. Driscoll further noted that his thought process was organized with no indication of a formalized thought disorder and his thought content was focused on the evaluation. She also observed that plaintiff's mood was depressed and defensive, that his affect was consistent with his mood, and that his insight and judgment were fair. (*Id.*) Plaintiff denied thoughts of harm to himself or others. (R. 442.) Ms. Driscoll recommended therapy as well as possible medication. (*Id.*) Ms. Driscoll's report indicates that plaintiff was seen ten times over the course of ten months, beginning on a schedule of once per month, and increasing that when he entered a pre-trial diversion program and the probation department mandated bi-weekly sessions. (R. 443.) She also reported that therapy was "terminated, by mutual agreement, when [client] had made progress on alleviating anxiety and probation was ended." (R. 443.)

On January 9, 2002, Dr. Michael Falkoff reported that a stress test taken by plaintiff showed normal sinus rhythm. Dr. Falkoff indicated that plaintiff had no chest pain or major ST depression, but that he had a right bundle branch block. (R. 418.)

On May 20, 2002, plaintiff saw Dr. Ippolito concerning a colonoscopy, scheduled for June 17, 2002. (R. 463.) Dr. Ippolito noted that plaintiff was worried about the colonoscopy and had been ruminating about it for the past year, which concern, Dr. Ippolito concluded, was affecting plaintiff's appetite. (*Id.*) Dr. Ippolito's impression was persistent weight loss and anxiety due to increased stress. He believed that plaintiff would benefit from

anti-anxiety medications, but noted that plaintiff had refused medications in the past. Dr. Ippolito thought that after plaintiff had undergone the colonoscopy, some of plaintiff's stress would be relieved and his appetite would improve. (*Id.*)

Plaintiff next saw Dr. Ippolito on June 5, 2002. (R. 392.) Dr. Ippolito reported that plaintiff had been incarcerated the day before for street peddling. Dr. Ippolito stated that plaintiff's pulse was regular and that an EKG appeared normal. He prescribed Trazodone for insomnia. (*Id.*)

Plaintiff returned to Dr. Ippolito on August 28, 2002. (R. 394.) Plaintiff was still anxious and had not tried taking the Trazodone Dr. Ippolito prescribed for him. Dr. Ippolito reported that plaintiff's weight had not changed. Dr. Ippolito believed that anxiety limited plaintiff's ability to take in adequate calories, but he stated that plaintiff was not underweight. (*Id.*)

On March 10, 2003, Dr. Falkoff conducted a stress echocardiogram on plaintiff. (R. 413.) He reported that the results were negative for ischemia and showed normal left ventricular systolic function with no major valvular abnormalities. (*Id.*)

Plaintiff visited Dr. Falkoff again on March 19, 2003 complaining of a fast heartbeat. (R. 414.) Plaintiff's blood pressure was 118/70 and his heart rate was 68. Dr. Falkoff commented that plaintiff seemed to be disabled by cardiac arrhythmia, but noted that plaintiff was in good general health and could be a candidate for ablation. Dr. Falkoff recommended that plaintiff try Toprol. (*Id.*)

Plaintiff had another stress echocardiogram on March 19, 2003. (R. 415.) Dr. Falkoff reported that, at the time of the test, plaintiff had no chest pain or arrhythmias. The test showed sinus rhythm, but also showed that plaintiff had one atrial premature contraction.

(*Id.*)

Plaintiff saw Dr. Falkoff on April 3, 2003, at which time Dr. Falkoff recommended a trial of Tikosyn in a hospital setting with electrophysiology study and, as a last choice, catheter ablation of atrial fibrillation. (R. 411.) Plaintiff returned to Dr. Falkoff's office on April 23, 2003 and he told Melissa O'Sullivan, a nurse practitioner in Dr. Falkoff's office, that he was very frightened of the medication, was quite anxious and had suicidal thoughts. (R. 410.) Due to plaintiff's suicidal thoughts, Ms. O'Sullivan called police who brought plaintiff to Strong Memorial Hospital. (*Id.*)

In regard to the suicidal ideation he voiced at Dr Falkoff's offfice, plaintiff was seen by Behavioral Health Services at Strong Memorial Hospital on April 22, 2003. (R. 631, 634, 637, 655.) Plaintiff explained that he had used a figure of speech in Dr. Falkoff's office and that in his culture, people are emotional and say things "in a big way." (R. 631, 655, 764.) He stated that he had no intention of harming himself. Dr. Glenn Currier, a staff psychiatrist, concluded that plaintiff was a low risk of harm to himself and others. (R. 634.)

Plaintiff returned to Strong Memorial Hospital on April 30, 2003, on an outpatient basis, where he saw Mary Turner, a nurse practitioner. (R. 655.) He denied suicidal or homicidal ideation. Ms. Turner believed that plaintiff would benefit from medication and supportive psychotherapy. (*Id.*)

Dr. Jose Lopez was plaintiff's primary care physician from May 20, 2003 to January 27, 2004. (R. 454-59, 690.) He diagnosed plaintiff's conditions as paroxysmal atrial fibrillation, anxiety, diabetes mellitus (diet controlled) and hematuria. (R. 690.)

Dr. Chee Kim, a cardiologist, evaluated plaintiff on June 15, 2003. (R. 460.) Plaintiff and Dr. Kim agreed that he would undergo an electrophysiology study to see if he was a candidate for radio frequency ablation. (R. 460.)

Plaintiff saw Rekha Shrivastava, a therapist, with Unity Health System on November 21, 2003. (R. 446-51, 675, 682.) On this occasion, plaintiff was very anxious about dying because of his medical problems, and this anxiety made it difficult for him to face daily tasks and obligations. (R. 447, 448, 682, 683.) Ms. Shrivastava noted that plaintiff "used to drown all his worries in alcohol[,] but since [1997] he has been sober, [and] it is hard for him to deal with his worries and anxieties." (R. 447.) She further noted that plaintiff was very intelligent and a good self advocate, that he was neatly dressed in clean clothes, that he was alert and oriented to person, time and place, and that his motor activity was normal (R. 448 449, 684,[6] 685.) However, she reported that, although his speech was accelerated due to anxiety, it was normal for pitch and volume. (R. 449.) Additionally, Ms. Shrivastava noted that plaintiff's thought process was clear and coherent with no evidence of any formal thought disorder, and that his affect was full (R. 684, 685.) Ms. Shrivastava concluded that plaintiff was "too focused" on his medical conditions and that his mood was anxious. (R. 685.) Plaintiff's affect was full, his insight was fair and his judgment appeared to be intact, and she recommended that plaintiff begin individual therapy to learn cognitive behavioral techniques to help manage his "self defeating" thoughts and to learn coping skills to deal with his stressors. (*Id.*)

---

[6]The same information is contained in Ms. Shrivastava's report dated April 6, 2004, in the record at 681-89. The portion discussing "thought process" is complete in the later report, whereas the Ms. Shrivastava's report dated November 21, 2003, at 446-53, is missing page five, the page that evidently has the "thought process" information on it.

Ms. Shrivastava saw plaintiff again on February 6, 2004. (R. 453.) She stated that plaintiff was "too focused on his disability and it appears that his motivation to seek treatment is to get on disability and not to learn techniques." (R. 453.) Ms. Shrivastava explained the benefits of relaxation techniques but noted that plaintiff was not very receptive. Plaintiff denied any suicidal or homicidal ideation. (*Id.*)

On March 1, 2004, Dr. Lopez prepared a residual functional capacity report. (R. 690-97.) Dr. Lopez indicated that plaintiff's abilities to sit, stand, walk, lift/carry and push/pull were not affected by his impairment. (R. 691-92.) He further indicated that plaintiff had no limitation in reaching, grasping, handling, fingering/feeling and pushing/pulling of arm and leg controls. (R. 692-93.) Dr. Lopez found that plaintiff could frequently bend, and could occasionally climb, work above shoulder level, balance, stoop, squat, kneel, crawl and crouch. (R. 692.) Dr. Lopez pointed out that plaintiff had a "partial restriction" from working in a stressful environment and that anxiety may be a limiting factor. (R. 694.) He rated plaintiff's overall mental impairment as "mild" and stated that plaintiff was capable of working full time on a sustained competitive basis. (R. 694, 696.) Nevertheless, Dr. Lopez indicated that plaintiff had marked limitations in the following areas: (1) the ability to remember locations and work-like procedures; (2) the ability to understand and remember very short and simple instructions; (3) the ability to understand and remember detailed instructions; (4) the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (5) the ability to be aware of normal hazards and take appropriate precautions, along with moderate limitations in eleven other areas. (R. 694-96.)

On March 30, 2004, the ALJ requested that Dr. Lopez clarify information in his mental capacity assessment due to inconsistencies. (R. 657.) In an assessment on March 31, 2004, Dr. Lopez found that plaintiff's ability to understand, remember and carry out instructions was not affected by his impairment. (R. 662.) In the area of sustained concentration and persistence, Dr. Lopez found that plaintiff had no limitation in four sub-categories, a slight limitation in one subcategory and moderate limitations in two subcategories. (R. 663.) Moderate impairment was described on the form Dr. Lopez completed as, "moderate limitation in this area but the individual is still able to function satisfactorily." (R. 662.)

On March 3, 2004, plaintiff was evaluated by Dr. Prakash Reddy, a psychiatrist, who is affiliated with Unity Health System. (R. 674-80.) Dr. Reddy observed that plaintiff was neatly dressed and groomed and was cooperative and that his motor activity was within normal limits and his speech was spontaneous and coherent. He further noted that plaintiff's thought process was goal directed and he exhibited no evidence of delusions, suicidal ideation or homicidal ideation. Plaintiff described his mood as "depressed and anxious" due to medical problems. Dr. Reddy concluded that plaintiff's affect was appropriate and commensurate with his thought content, and he found that plaintiff's insight and judgment were fair. Dr. Reddy stated that plaintiff was alert, oriented to place, person and time, that his concentration was fair, and that his memory was intact for recent and remote events. Dr. Reddy found no evidence of a thought disorder or perceptual disorder. In his treatment recommendations, Dr. Reddy wrote that plaintiff was not interested in learning cognitive behavioral therapy skills for anxiety, that he was afraid of taking any medication for his anxiety out of fear that it would react with Coumadin®, that

he wanted someone to convince his cardiologist to refer him to a treatment center outside

of New York, and that since Dr. Reddy did not "know any cardiologist in town to advocate

for him," plaintiff left his office. (R. 679.)

On April 6, 2004, plaintiff's case at Unity Health System was closed and he was

discharged due to noncompliance. (R. 688-89.) Ms. Shrivastava wrote in her report that,

> [h]e only wanted to have a working diagnosis so that he can be rendered
> disable[d] to go to work. He had a lot of health related problems and was
> somaticizing them to[o]. His anxiety was related to his health related
> concerns. P[atien]t missed his appt with [the] writer on 3/15/04. Writer tried
> to reach him but his phone number has been disconnected. This case is
> being closed on grounds of nonco[m]pliance.

(R. 688.)

## STANDARD OF REVIEW

### A. The Standard for Finding a Disability

For purposes of the Social Security Act, disability is the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months." Social Security Act

section 223(d)(1)(A), 42 U.S.C. § 423(d)(1)(A) (2005); *Schaal v. Apfel*, 134 F.3d 496, 501

(2d Cir. 1998). The determination of impairment involves both objective and subjective

factors, including: (1) objective medical facts and clinical findings; (2) diagnoses and

medical opinions of examining physicians; (3) subjective evidence of pain and disability

testified to by the claimant, claimant's family or others; and (4) the claimant's educational

background, age, and work experience. *See Riveral v. Schweiker*, 717 F.2d 719, 723 (2d

Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

-16-

The Social Security Administration ("SSA") has promulgated regulations which establish a five-step sequential analysis an ALJ must follow:

> First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities." If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501(citations and internal quotation marks omitted). Plaintiff bears the burden of proof for steps one through four. *Harrison v. Apfel*, 62 F. Supp. 2d 1047, 1053 (W.D.N.Y. 1999). The burden of proof shifts to the Commissioner for the fifth step. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179-80 (2d Cir.1998); *Colon v. Apfel*, No. 98 Civ. 4732 (HB) 2000 WL 282898, *3 (S.D.N.Y. Mar. 15, 2000).

### B. The Standard of Review

The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal*, 134 F.3d at 501. It is well settled that

> it is not the function of a reviewing court to determine de novo whether the claimant is disabled. Assuming the Secretary [Commissioner] has applied proper legal principles, judicial review is limited to an assessment of whether the findings of fact are supported by substantial evidence; if they are supported by such evidence, they are conclusive.

*Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

Where there are gaps in the administrative record or where the Commissioner has applied an incorrect legal standard, remand for further development of the record may be appropriate. *Parker*, 626 F.2d at 235. However, where the record provides persuasive proof of disability and a remand would serve no useful purpose, the Court may reverse and remand for calculation and payment of benefits. *Id.*

Federal courts are not empowered to review the Commissioner's denial of disability benefits de novo. *See Williams v. Callahan*, 30 F. Supp. 2d 588, 592 (E.D.N.Y. 1998); *Fishburn v. Sullivan*, 802 F. Supp. 1018, 1023 (S.D.N.Y. 1992). The scope of review involves first the determination of whether the ALJ applied the correct legal standards, and second, whether the ALJ's decision is supported by substantial evidence. *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). Although district court is not bound by the Commissioner's conclusions and inferences of law, the ALJ's findings and inferences of fact are entitled to judicial deference. *Grubb v. Chater*, 992 F. Supp. 634, 637 (S.D.N.Y. 1998). Absent legal error, the Commissioner's finding that a claimant is not disabled is conclusive if supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Filocomo v. Chater*, 944 F. Supp. 165, 168 (E.D.N.Y. 1996). Substantial evidence is more than a mere scintilla. It is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotation omitted).

**ANALYSIS**

Plaintiff raises three points in his memorandum of law in support of his position that he is entitled to judgment on the pleadings. First, plaintiff contends that, contrary to 20 C.F.R. § 404.1523 (1985), the ALJ's decision failed to consider the combined effects of all his impairments. (Pl.'s Mem. of Law at 2.) At the outset, the Court notes that the ALJ acknowledged in her decision that the regulations required her to consider "all medically determinable impairments…" in the sequential analysis. (R. 23.) However, plaintiff argues that the ALJ's decision that plaintiff did not have severe mental impairments is not supported by substantial evidence. (*Id.* at 3.) More specifically, plaintiff contends that the ALJ's determination that plaintiff has "'non-severe' impairments of an anxiety disorder and a diagnosis of anti-social personality disorder" (R. 26), are inconsistent with Dr. Davenport's conclusions and, therefore, not supported by substantial evidence. (Pl.'s Mem. of Law at 3.) The Court disagrees.

The Commissioner's regulations direct the following:

What we mean by an impairment(s) that is not severe.

(a) Non-severe impairment(s). An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities.

(b) Basic work activities. When we talk about basic work activities, we mean the abilities and aptitudes necessary to do most jobs. Examples of these include—

(1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2) Capacities for seeing, hearing, and speaking;

(3) Understanding, carrying out, and remembering simple instructions;

(4) Use of judgment;

(5) Responding appropriately to supervision, co-workers and usual work situations; and

(6) Dealing with changes in a routine work setting.

20 C.F.R. § §404.1521 (1985).

Dr. Davenport concluded that plaintiff would be able to follow and understand simple directions and instructions, as well as perform simple rote tasks under supervision. (R. 329.) She also stated in her report that he would probably be able to maintain attention and concentration for short periods of time, although he might have difficulty consistently performing simple tasks over time because of symptoms of depression. (R. 329.) She concluded that plaintiff's judgment was "fair." (R. 328.) Although she did write that, "findings from [her] evaluation are consistent with allegations of a significant psychological disorder" (R. 329), the Court finds that her report supports the ALJ's conclusion that plaintiff suffered only a "non-severe" mental limitation.

In support of his contentions relating to the severity of his mental impairments, plaintiff also relies on the residual functional capacity report completed by Dr. Lopez, dated March 1, 2004. (R. 618-21, duplicated at R. 690-96.[7]) In that report, Dr. Lopez rated plaintiff's overall mental impairment as "mild" and stated that plaintiff was capable of working full time on a sustained competitive basis. (R. 694, 696.) Despite these findings, Dr. Lopez indicated that plaintiff had marked limitations in four areas pertaining to mental limitations. Commendably, the ALJ requested that Dr. Lopez clarify his report, which he did

---

[7]Typical of this record, the same report is repeated; however, the citation by plaintiff's counsel refers to the incomplete report (only the odd pages are included in R. 618-21, whereas at R. 690-96, the complete report is included).

on March 31, 2004. In his clarified report, Dr. Lopez found that plaintiff's ability to understand, remember and carry out instructions was not affected by his impairment. (R. 662.) In the area of sustained concentration and persistence, Dr. Lopez found that plaintiff had no limitation in four sub-categories, a slight limitation in one sub-category and moderate limitations in two subcategories. (R. 663.) Moderate impairment was described on the form Dr. Lopez filled out as, "moderate limitation in this area but the individual is still able to function satisfactorily." (R. 662.) Consequently, the ALJ's determination that plaintiff suffered only a non-severe limitation impairment with regard to his mental health is supported by substantial evidence in the record.

Finally as to his argument that the ALJ failed to consider the combined effects of all his impairments, plaintiff cites to Dr. Ippolito's progress note of November 24, 2000 and Dr. Falkoff's letter of March 23, 2003,[8] which both pertain to plaintiff's physical impairments. The Court turns first to Dr. Ippolito's November 24, 2000 progress note, occasioned by plaintiff's visit for the purpose of completing disability forms. In his note, Dr. Ippolito wrote that plaintiff "was unable to effectively maintain a position in the work place on a functional and consistent basis due to his medical illnesses, which include diabetes, paroxysmal atrial fibrillation, which predisposes him to episodes of severe palpitation and in the past has required hospitalization." (R. 487.) However, the ALJ found that this conclusion on the part of Dr. Ippolito was not supported by the appropriate medical signs and findings. In that regard, just two months prior to this, Dr. Ippolito saw plaintiff, who was concerned that his weight had dropped to 164 pounds. Dr. Ippolito reassured plaintiff and wrote in his

---

[8]Plaintiff cites to R. 414, which is a letter from Dr. Falkoff to Dr. Pamela Tarkington dated March 20, 2003, not March 23, 2003.

progress note that plaintiff's atrial fibrillations were stable on medication and his heart was

regular. (R. 491.) Subsequent to the November 24, 2000 opinion that plaintiff was disabled,

Dr. Ippolito saw plaintiff on numerous occasions, but the findings he made on those visits

also fail to support his conclusion of disability. For example, on January 18, 2001, as the

ALJ points out in her decision, Dr. Ippolito saw plaintiff, writing that plaintiff continued to

complain of experiencing arrhythmias, and noted he had been seen in cardiology multiple

times. He further noted, though, that plaintiff, "is quite [an] anxious individual and I have

counseled him in the past. I think he would be a good candidate for antianxiety

medication," and Dr. Ippolito provided plaintiff with a sample of Serzone. (R. 483.) Nothing

in Dr. Ippolito's examination notes indicates that there was a basis for his November 24,

2000 opinion of disability. Nonetheless, at oral argument, the Commissioner's counsel

conceded[9] that the case should be remanded because, as to Dr. Ippolito's conclusion

regarding plaintiff's physical impairments, the ALJ failed to properly apply the treating

physician rule.

   Next, the Court considers Dr. Falkoff's March 23, 2003 letter. While plaintiff

suggests that Dr. Falkoff, in that correspondence, concludes that plaintiff is disabled from

working (Pl.'s Mem. of Law at 5), the Court finds that is not the case. Rather, an

examination of the context in which Dr. Falkoff's uses the terms "disabled" and "disability"

in his correspondence, leads to the conclusion that he is using these terms to refer to a

---

[9]Counsel for the Commissioner initially stated, "I do believe the ALJ's opinion is somewhat weak in addressing the medical opinions of Dr. Ippolito." Real-time transcript of oral argument (Feb. 2, 2006) at 8-9. On that issue, the Court subsequently asked, "[a]nd I want to be clear, essentially, that the Commissioner at this point is basically conceding its return for clarification with respect to the treating physician rule?" Counsel for the Commissioner responded, "Yes." *Id*. at 11.

treatable physical impairment. Specifically he says, in pertinent part,

> [a]t this time, I would recommend trying Toprol for a few days at 50 mg. qd. until he is again stable and we can then go back and see how he does. If he has more spells, he many need permanent addition of Toprol. He does seem to be disabled by this cardiac arrthythmia. He is adamant about wanting something better. He may be a candidate for ablation therapy. He certainly does want to try something else. I agree because of the disability from this, the constant concern, medications, and he is in good general health and I feel he is a candidate for ablation.

(R. 414.)

In the second point of his memorandum, plaintiff asserts that the ALJ improperly applied 20 C.F.R. § 404.1530 regarding plaintiff's refusal to take anti-anxiety medication. (Pl.'s Mem. of Law at 5.) That regulation states,

> Need to follow prescribed treatment.
>
> (a) What treatment you must follow. In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work.
>
> (b) When you do not follow prescribed treatment. If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits.
>
> (c) Acceptable reasons for failure to follow prescribed treatment. We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reason for failure to follow prescribed treatment. The following are examples of a good reason for not following treatment:
>
> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion.
>
> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.
>
> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.

(4) The treatment because of its magnitude (*e.g.* open heart surgery), unusual nature (*e.g.*, organ transplant), or other reason is very risky for you; or

(5) The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. § 404.1530 (1994). Plaintiff contends that the ALJ erred by ignoring acceptable reasons in the record for his failure to take anti-anxiety medications and other medications for his mental impairments. (Pl.'s Mem. of Law at 5-6.) He argues that since he was concerned that the suggested medications would interact negatively with Coumadin®, which he needs for his heart, he was justified in refusing to take any anti-anxiety medications. However, the Court notes that the ALJ did not make a specific finding on this point, and the reason why is evident from Social Security Ruling 82-59. In that ruling, the Commissioner permits a finding on this issue only if all four of the listed conditions in the ruling are met. One of the conditions is, "[t]he evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity…." SSR 82-59. Since the ALJ determined that plaintiff's mental limitations did not impair his ability to engage in substantial gainful activity, the ALJ could not have made a finding that his refusal to take medication was a failure to follow treatment. *See Roberts v. Shalala*, 66 F.3d 179, 183 (9th Cir. 1995); *Lozado v. Barnhart*, 331 F. Supp. 2d 325, 340 (E.D. Pa. 2004).

In the third point of his memorandum, plaintiff contends that by rejecting plaintiff's counsel's cross-examination of the vocational expert, the ALJ ignored substantial evidence of his disability. (Pl.'s Mem. of Law at 7.) Although plaintiff cites to portions of the record (R. 785-94) in which he argues that substantial evidence of his disability is laid out, he does not specifically point out what that evidence is. In reviewing the cited portions of the record,

the Court notes that the hypothetical question propounded by counsel at R. 787 was based on Dr. Lopez's findings of moderate and marked limitations in his report of March 1, 2004 (R. 690-96), which the Court has discussed in detail above. Inconsistencies in that report were clarified by Dr. Lopez, and in his amended report, dated March 31, 2004 (R. 657-65), Dr. Lopez opined that even considering plaintiff's slight to moderate mental impairments, he "is capable of performing work on a full-time competitive basis." (R. 665.)

During oral argument, the Court made inquiry of plaintiff's counsel concerning Dr. Lopez's subsequent clarification of his opinions at the request of the ALJ. Counsel responded that despite such clarification, Dr. Lopez's initial conclusions were part of the record, and the ALJ's failure to explain her reasons for rejecting them, based upon the hypothetical question put to the vocational expert, was error. Since, as indicated earlier, the Commissioner's counsel conceded that this matter must be remanded for proper consideration of the treating physician rule as it pertains to Dr. Ippolito, the Court need not address this alleged error.

## CONCLUSION

Accordingly, the Commissioner's decision denying supplemental security benefits and disability benefits is reversed, and the matter is remanded pursuant to the fourth sentence of § 405(g) for proper consideration of the treating physician rule.

It Is So Ordered.

Dated:   February 7, 2006
       Rochester, NY
              ENTER:

                    /s/ Charles J. Siragusa
                    CHARLES J. SIRAGUSA
                    United States District Judge